UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

United States Courts
Southern District of Texas
FILED

FEB 0 6 2009

Michael N. Milby, Clerk

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | Criminal No. |
| ) | **H-09-   071** |
| v. ) | 18 U.S.C. § 371 |
| ) | 15 U.S.C. § 78dd-2 |
| KELLOGG BROWN & ROOT LLC, ) | |
| ) | |
| Defendant. ) | |
| ——————————————— ) | |

## INFORMATION

The United States charges:

## General Allegations

At all times material to this Information, unless otherwise stated:

1.     The Foreign Corrupt Practices Act of 1977, as amended, Title 15, United States Code, Sections 78dd-1, *et seq.* ("FCPA"), was enacted by Congress for the purpose of, among other things, making it unlawful for certain classes of persons and entities to act corruptly in furtherance of an offer, promise, authorization, or payment of money or anything of value to a foreign government official for the purpose of securing any improper advantage, or of assisting in obtaining or retaining business for, or directing business to, any person.

**Relevant Entities and Individuals**

***The Defendant, Its Predecessor Companies, and Their CEO***

2.      Defendant Kellogg Brown & Root LLC is a wholly owned subsidiary of KBR, Inc., a publicly traded company incorporated in Delaware in 2006 and headquartered in Houston, Texas.  Kellogg Brown & Root LLC is the successor company to Kellogg Brown & Root, Inc. and, before that, to The M.W. Kellogg Company.  Throughout this Information, "KBR" shall refer to Kellogg Brown & Root LLC and its predecessor companies.  KBR was engaged in the business of providing engineering, procurement, and construction ("EPC") services around the world, including designing and building liquefied natural gas ("LNG") production plants. KBR was incorporated in Delaware and headquartered in Houston, Texas. As such, KBR was a "domestic concern" within the meaning of the FCPA, Title 15, United States Code, Section 78dd-2.

3.      Albert Jackson Stanley ("Stanley") was a United States citizen and a resident of Houston, Texas.  Stanley served in various capacities as an officer and/or director of KBR, including as President from in or about June 1995 until in or about 1997, Chief Executive Officer from in or about 1997 until in or about March 2001, and Chairman from in or about April 2001 until in or about June 2004.  Stanley was a "domestic concern" and an

2

officer, employee, and agent of a "domestic concern" within the meaning of the FCPA, Title 15, United States Code, Section 78dd-2.

### The Joint Venture, Its Members, and Related Entities

4.     The "Joint Venture" was a four-company joint venture formed in 1991 for the purposes of bidding on and, if successful, performing a series of EPC contracts to design and build an LNG plant and several expansions on Bonny Island, Nigeria ("the Bonny Island Project"). The Joint Venture consisted of KBR and three other companies referred to herein as "EPC Contractor B," "EPC Contractor C," and "EPC Contractor D." The Steering Committee of the Joint Venture consisted of high-level executives from each of the four joint venture companies, including Stanley on behalf of KBR. Pursuant to a joint venture agreement, the Steering Committee made major decisions on behalf of the Joint Venture, including whether to hire agents to assist the Joint Venture in winning EPC contracts, whom to hire as agents, and how much to pay the agents. Profits, revenues, and expenses, including the cost of agents, were shared equally among the four joint venture partners.

5.     "EPC Contractor B" was engaged in the business of providing EPC services around the world. EPC Contractor B was headquartered in Paris, France. In October 2001, EPC Contractor B became listed on the

New York Stock Exchange. As an issuer of publicly traded securities registered pursuant to Section 12(b) of the Securities Exchange Act of 1934, Title 15, United States Code, Section 78l, EPC Contractor B was required to file periodic reports with the United States Securities and Exchange Commission ("SEC") under Section 13 of the Securities Exchange Act, Title 15, United States Code, Section 78m. Accordingly, beginning in October 2001, EPC Contractor B was an "issuer" within the meaning of the FCPA, Title 15, United States Code, Section 78dd-1.

6. "EPC Contractor C" was an engineering and construction company headquartered in Milan, Italy. EPC Contractor C was a wholly owned subsidiary of an integrated energy services company headquartered in Rome, Italy. The parent company of EPC Contractor C was listed on the New York Stock Exchange, had registered securities, and filed periodic reports with the SEC. Accordingly, the parent company of EPC Contractor C was an "issuer" within the meaning of the FCPA, Title 15, United States Code, Section 78dd-1.

7. "EPC Contractor D" was an engineering and construction company headquartered in Yokohama, Japan. EPC Contractor D was a "person" within the meaning of the FCPA, Title 15, United States Code, Section 78dd-3.

8.     M.W. Kellogg Ltd. was a corporation organized under the laws of the United Kingdom.  M.W. Kellogg Ltd. was 55% owned by KBR and 45% owned by EPC Contractor D.

9.     The Joint Venture operated through three Portuguese special purpose corporations based in Madeira, Portugal: "Madeira Company 1," "Madeira Company 2," and "Madeira Company 3."  Both Madeira Company 1 and Madeira Company 2 were owned equally by the four joint venture companies.  Madeira Company 3, the entity that the Joint Venture used to enter into consulting agreements with the Joint Venture's agents, was 50% owned by M.W. Kellogg Ltd., 25% owned by EPC Contractor B, and 25% owned by EPC Contractor C.  KBR held its interest in Madeira Company 3 indirectly through M.W. Kellogg Ltd., rather than directly, as part of KBR's intentional effort to insulate itself from FCPA liability for bribery of Nigerian government officials through the Joint Venture's agents.  The boards of managers of Madeira Company 1 and Madeira Company 2 included U.S. citizens, including Stanley, but KBR avoided placing U.S. citizens on the board of managers of Madeira Company 3 as a further part of KBR's intentional effort to insulate itself from FCPA liability.

**The Joint Venture's Agents**

10.    "Consultant A" was a citizen of the United Kingdom and a resident of London, England.  The Joint Venture hired Consultant A to help it obtain business in Nigeria, including by offering to pay and paying bribes to high-level Nigerian government officials.  Consultant A was an agent of the Joint Venture and of each of the joint venture companies.

11.    "Consulting Company A" was a Gibraltar corporation that Consultant A used as a corporate vehicle to enter into agent contracts with and receive payments from the Joint Venture.  By the time the Joint Venture had stopped paying Consulting Company A in January 2004, the Joint Venture had paid Consulting Company A over $130 million for use in bribing Nigerian government officials.  Consulting Company A was an agent of the Joint Venture and of each of the joint venture companies.

12.    Consulting Company B was a global trading company headquartered in Tokyo, Japan.  The Joint Venture hired Consulting Company B to help it obtain business in Nigeria, including by offering to pay and paying bribes to Nigerian government officials.  By the time the Joint Venture had stopped paying Consulting Company B in June 2004, the Joint Venture had paid Consulting Company B over $50 million for use in

bribing Nigerian government officials. Consulting Company B was an agent of the Joint Venture and of each of the joint venture companies.

### The Nigerian Government Entities

13.　The Nigerian National Petroleum Corporation ("NNPC") was a Nigerian government-owned company charged with development of Nigeria's oil and gas wealth and regulation of the country's oil and gas industry. NNPC was a shareholder in certain joint ventures with multinational oil companies. NNPC was an entity and instrumentality of the Government of Nigeria, within the meaning of the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1)(A) and 78dd-2(h)(2)(A). Officers and employees of NNPC were "foreign officials," within the meaning of the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1)(A) and 78dd-2(h)(2)(A).

14.　Nigeria LNG Limited ("NLNG") was created by the Nigerian government to develop the Bonny Island Project and was the entity that awarded the related EPC contracts. The largest shareholder of NLNG was NNPC, which owned 49% of NLNG. The other owners of NLNG were multinational oil companies. Through the NLNG board members appointed by NNPC, among other means, the Nigerian government exercised control over NLNG, including but not limited to the ability to block the award of

EPC contracts. NLNG was an entity and instrumentality of the Government of Nigeria, within the meaning of the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1)(A) and 78dd-2(h)(2)(A). Officers and employees of NLNG were "foreign officials," within the meaning of the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1)(A) and 78dd-2(h)(2)(A).

### The Bonny Island Project

15. Between 1995 and 2004, the Joint Venture was awarded four EPC contracts to build the Bonny Island Project. Each EPC contract corresponded to one of the four phases in which the Bonny Island Project was constructed. An LNG "train" is the infrastructure necessary to pipe raw natural gas from wellheads, convert the raw gas to purified LNG, and deliver that LNG to a tanker. The first phase of the Bonny Island Project consisted of two trains (Trains 1 and 2), the second phase consisted of one train (Train 3), the third phase consisted of two trains (Trains 4 and 5), and the fourth phase consisted of one train (Train 6). The first EPC contract, covering Trains 1 and 2, was awarded to the Joint Venture through an ostensibly competitive international tender. The other three EPC contracts were awarded to the Joint Venture on a sole-source, negotiated basis. The four EPC contracts awarded to the Joint Venture collectively were valued at over $6 billion.

## COUNT 1

### Conspiracy to Violate the Foreign Corrupt Practices Act
### (18 U.S.C. § 371)

16.    Paragraphs 1 through 15 are realleged and incorporated by reference as though fully set forth herein.

17.    From at least in or around August 1994, through in or around June 2004, in the Southern District of Texas, and elsewhere, defendant KBR did unlawfully, willfully, and knowingly combine, conspire, confederate, and agree with the Joint Venture, EPC Contractor B, EPC Contractor C, EPC Contractor D, Stanley, Consultant A, Consulting Company A, Consulting Company B, and others, known and unknown, to commit offenses against the United States, that is, to willfully make use of the mails and means and instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value to any foreign officials, and any person while knowing that all or a portion of such money or thing of value would be or had been offered, given, or promised, directly or indirectly, to foreign officials, for purposes of: (i) influencing acts and decisions of such foreign officials in their official capacities; (ii) inducing such foreign officials to do and omit to do acts in violation of the lawful duties of such officials; (iii)

9

securing an improper advantage; and (iv) inducing such foreign officials to use their influence with a foreign government and instrumentalities thereof to affect and influence acts and decisions of such government and instrumentalities, in order to assist KBR, the Joint Venture, and others in obtaining and retaining business for and with, and directing business to, KBR, the Joint Venture and others, in violation of Title 15, United States Code, Sections 78dd-1, 78dd-2, and 78dd-3.

## Purpose of the Conspiracy

18.     The purpose and object of the conspiracy was to secure the assistance of officials of the executive branch of the Government of Nigeria, officials of NNPC, officials of NLNG, and others in obtaining and retaining billions of dollars in contracts related to the Bonny Island Project through the promise and payment of tens of millions of dollars in bribes to those officials.

## Manner and Means of the Conspiracy

19.     KBR and its co-conspirators employed various manner and means to carry out the conspiracy, including but not limited to the following:

a.      Stanley, other officers and employees of KBR, and their co-conspirators held so-called "cultural meetings" at which they discussed, among other things, the use of particular agents to pay bribes to officials of

the Government of Nigeria in order to secure the officials' support for the Joint Venture in obtaining and retaining contracts to build the Bonny Island Project.

b.     Stanley, other officers and employees of KBR, and their co-conspirators agreed that the Joint Venture would hire Consulting Company A to pay bribes to high-level Nigerian government officials, including top-level executive branch officials, and Consulting Company B to pay bribes to lower level Nigerian government officials, including employees of NLNG, in exchange for the officials' assistance in obtaining and retaining contracts to build the Bonny Island Project.

c.     Stanley, other officers and employees of KBR, and their co-conspirators caused Madeira Company 3 to execute consulting contracts with Consulting Company A and Consulting Company B providing for the payment of tens of millions of dollars in consulting fees in exchange for vaguely described marketing and advisory services, when in fact the primary purpose of the contracts was to facilitate the payment of bribes on behalf of the Joint Venture and its members to Nigerian government officials.

d.     Prior to NLNG's award to the Joint Venture of the various EPC contracts, Stanley and other co-conspirators met with three successive holders of a top-level office in the executive branch of the

11

Government of Nigeria and subsequently negotiated with the office holders' representatives regarding the amount of the bribes that the Joint Venture would pay to the Nigerian government officials.

        e.      Stanley, other officers and employees of KBR, and their co-conspirators caused wire transfers totaling approximately $132 million to be sent from Madeira Company 3's bank account in Amsterdam, The Netherlands, to bank accounts in New York, New York, to be further credited to bank accounts in Switzerland and Monaco controlled by Consultant A for Consultant A to use to bribe Nigerian government officials.

        f.      On behalf of the Joint Venture and the four joint venture companies, Consultant A wire transferred bribe payments to or for the benefit of various Nigerian government officials, including officials of the executive branch of the Government of Nigeria, NNPC, and NLNG, and for the benefit of a political party in Nigeria.

        g.      Stanley, other officers and employees of KBR, and their co-conspirators caused wire transfers totaling over $50 million to be sent from Madeira Company 3's bank account in Amsterdam, The Netherlands, to Consulting Company B's bank account in Japan for Consulting Company B to use to bribe Nigerian government officials.

## Overt Acts

20.     In furtherance of the conspiracy and to achieve its purpose and object, at least one of the co-conspirators committed or caused to be committed, in the Southern District of Texas, and elsewhere, the following overt acts, among others:

a.     On or about August 3, 1994, the M.W. Kellogg Ltd. salesperson responsible for the Bonny Island Project ("Salesperson A") sent a facsimile from London, England, to Stanley in Houston, Texas, and to other co-conspirators stating, among other things, that Stanley and other top executives of the joint venture companies had agreed to send a message "to the top man that we are ready to do business in the customary manner" and to ask Consulting Company B to secure support from the key individuals at the working level of NLNG.

b.     On or about November 2, 1994, Consultant A told Salesperson A that he had spoken with a senior official of the Nigerian Ministry of Petroleum, that Consultant A's fee would be $60 million, that the first top-level executive branch official of the Government of Nigeria would get $40-45 million of that fee, that other Nigerian government officials would get the remaining $15-20 million of that fee, and that there would be a meeting between Stanley and the first top-level Nigerian

executive branch official before the execution of any written agreement between the Joint Venture and Consultant A.

      c.     On or about November 30, 1994, Stanley and other co-conspirators met in Abuja, Nigeria, with the first top-level executive branch official of the Government of Nigeria to verify that the official was satisfied with the Joint Venture using Consultant A as its agent and to confirm that the first top-level executive branch official wanted the Joint Venture to negotiate with the senior official of the Ministry of Petroleum the amounts of bribes to various Nigerian government officials.

      d.     On or about March 20, 1995, Madeira Company 3 entered into an agreement with Consulting Company A providing, among other things, that Madeira Company 3 would pay $60 million to Consulting Company A if the Joint Venture was awarded a contract to construct Trains 1 and 2 of the Bonny Island Project.

      e.     On or about December 15, 1995, Madeira Company 3 wire transferred $1,542,000 to Consulting Company A, via a correspondent bank account in New York, New York, in payment of Consulting Company A's first invoice under the consulting agreement for Trains 1 and 2.

      f.     On or about April 9, 1996, Madeira Company 3 entered into an agreement with Consulting Company B whereby it agreed to pay

Consulting Company B $29 million for assisting the Joint Venture in winning the contract to build Trains 1 and 2 of the Bonny Island Project.

g.     On or about May 1, 1997, Stanley and other co-conspirators met in Abuja, Nigeria, with the first top-level executive branch official of the Government of Nigeria and requested that the official designate a representative with whom the Joint Venture should negotiate the bribes to Nigerian government officials in exchange for the first top-level executive branch official's support of the award of the Train 3 EPC contract to the Joint Venture.

h.     On or about February 28, 1999, Stanley and other co-conspirators met in Abuja, Nigeria, with a second top-level executive branch official of the Government of Nigeria to request that the official designate a representative with whom the Joint Venture should negotiate the bribes to Nigerian government officials in exchange for the second top-level executive branch official's support of the award of the Train 3 EPC contract to the Joint Venture.

i.     On or about March 5, 1999, Stanley, other officers and employees of KBR, and other co-conspirators met in London, England, with the representative designated by the second top-level executive branch official of the Government of Nigeria to negotiate the bribes to Nigerian

government officials in exchange for the award of the Train 3 EPC contract to the Joint Venture.

      j.      On or about March 18, 1999, Madeira Company 3 entered into an agreement with Consulting Company A providing, among other things, that Madeira Company 3 would pay $32.5 million to Consulting Company A if the Joint Venture was awarded a contract to construct Train 3 of the Bonny Island Project.

      k.      On or about March 13, 2000, Madeira Company 3 entered into a consulting agreement with Consulting Company B promising to pay it $4 million in connection with Train 3 of the Bonny Island Project.

      l.      On or about November 11, 2001, Stanley and a KBR salesperson met in Abuja, Nigeria, with a third top-level executive branch official of the Government of Nigeria and an NNPC official (the "NNPC Official") to request that the third top-level executive branch official designate a representative with whom the Joint Venture should negotiate the bribes to Nigerian government officials in exchange for the third top-level executive branch official's support of the award of the Trains 4 and 5 EPC contract to the Joint Venture.

      m.      On or about December 24, 2001, Madeira Company 3 entered into an agreement with Consulting Company A providing, among

other things, that Madeira Company 3 would pay $51 million to Consulting Company A if the Joint Venture was awarded a contract to construct Trains 4 and 5 of the Bonny Island Project.

        n.    In or about June 2002, Consultant A, the NNPC Official, and an employee of one of the Joint Venture's subcontractors (the "Subcontractor") met at a hotel in London, England, to discuss the NNPC Official's request that the Subcontractor help funnel payments from Consultant A to a political party in Nigeria.

        o.    On or about June 14, 2002, Madeira Company 3 entered into a consulting agreement with Consulting Company B providing, among other things, that Madeira Company 3 would pay $25 million to Consulting Company B in connection with Trains 4 and 5 of the Bonny Island Project.

        p.    On or about June 28, 2002, Madeira Company 3 entered into an agreement with Consulting Company A providing, among other things, that Madeira Company 3 would pay $23 million to Consulting Company A if the Joint Venture was awarded a contract to construct Train 6 of the Bonny Island Project.

        q.    In or about August 2002, an employee of the Subcontractor, using funds that Consulting Company A had wire transferred to the Subcontractor, delivered a pilot's briefcase containing one million

dollars in one hundred dollar bills to the NNPC Official at a hotel in Abuja, Nigeria, for the benefit of a political party in Nigeria.

r.     In or about April 2003, an employee of the Subcontractor, using funds that Consulting Company A had wire transferred to the Subcontractor, delivered a vehicle containing Nigerian currency valued at approximately $500,000 to the hotel of the NNPC Official in Abuja, Nigeria, for the benefit of a political party in Nigeria, leaving the vehicle in the hotel parking lot until the NNPC Official had caused the money to be removed.

s.     On or about June 15, 2004, Madeira Company 3 wire transferred $3 million to Consulting Company B in payment of one of Consulting Company B's invoices under the agreement for Trains 4 and 5 of the Bonny Island Project.

All in violation of Title 18, United States Code, Section 371.

## COUNTS 2-3

### Foreign Corrupt Practices Act
### (15 U.S.C. § 78dd-2)

21.     Paragraphs 1 through 15 and 18 through 20 are realleged and incorporated by reference as though fully set forth herein.

22.     On or about the dates set forth below, in the Southern District of Texas, and elsewhere, defendant KBR, being a domestic concern,

18

willfully did use and cause to be used instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, and authorization of the payment of money to a person, while knowing that all or a portion of such money would be or had been offered, given, or promised, directly or indirectly, to foreign officials, for purposes of: (i) influencing acts and decisions of such foreign officials in their official capacities; (ii) inducing such foreign officials to do and omit to do acts in violation of the lawful duties of such officials; (iii) securing an improper advantage; and (iv) inducing such foreign officials to use their influence with a foreign government and instrumentalities thereof to affect and influence acts and decisions of such government or instrumentalities, in order to assist defendant KBR, the Joint Venture, and others in obtaining and retaining business for and with, and directing business to, defendant KBR, the Joint Venture, and others, to wit, defendant KBR caused the following corrupt U.S. dollar payments to be wire transferred from Madeira Company 3's bank account in Amsterdam, The Netherlands, via correspondent bank accounts in New York, New York, to bank accounts of Consulting Company A for use in bribing Nigerian government officials:

19

| Count | Dates | Amounts | Description |
|-------|-------|---------|-------------|
| 2 | 3/29/99-5/30/03 | $32,273,750 | Payments to Consulting Company A (bank accounts in Switzerland and Monaco) Pursuant to Consulting Agreement for Train 3 |
| 3 | 4/1/02-1/12/04 | $39,800,000 | Payments to Consulting Company A (bank account in Switzerland) Pursuant to Consulting Agreement for Trains 4&5 |

All in violation of Title 15, United States Code, Section 78dd-2, and Title 18, United States Code, Section 2.

## COUNTS 4-5

### Foreign Corrupt Practices Act
### (15 U.S.C. § 78dd-2)

23.    Paragraphs 1 through 15 and 18 through 20 are realleged and incorporated by reference as though fully set forth herein.

24.    On or about the dates set forth below, defendant KBR, being a domestic concern, willfully did act corruptly outside the United States in furtherance of an offer, payment, promise to pay, and authorization of the payment of money to a person, while knowing that all or a portion of such money would be or had been offered, given, or promised, directly or indirectly, to foreign officials, for purposes of: (i) influencing acts and decisions of such foreign officials in their official capacities; (ii) inducing such foreign officials to do and omit to do acts in violation of the lawful duties of such officials; (iii) securing an improper advantage; and (iv)

inducing such foreign officials to use their influence with a foreign government and instrumentalities thereof to affect and influence acts and decisions of such government or instrumentalities, in order to assist defendant KBR, the Joint Venture, and others in obtaining and retaining business for and with, and directing business to, defendant KBR, the Joint Venture, and others, to wit, defendant KBR caused the following corrupt payments to be wire transferred from Madeira Company 3's bank account in Amsterdam, The Netherlands, to bank accounts of Consulting Company B in Japan for use in bribing Nigerian government officials:

| Count | Dates | Amounts | Description |
|-------|-------|---------|-------------|
| 4 | 4/17/00- 4/30/03 | $5,000,000 | Payments to Consulting Company B Pursuant to Consulting Agreement for Train 3 |
| 5 | 8/6/02- 6/15/04 | $17,000,000 | Payments to Consulting Company B Pursuant to Consulting Agreement for Trains 4&5 |

All in violation of Title 15, United States Code, Section 78dd-2, and

Title 18, United States Code, Section 2.

> STEVEN A. TYRRELL
> CHIEF, FRAUD SECTION
> CRIMINAL DIVISION
> U.S. DEPARTMENT OF JUSTICE

By: _William J. Stuckwisch_

> William J. Stuckwisch
> D.C. Bar No. 457278
> Patrick F. Stokes
> Maryland State Bar
> Senior Trial Attorneys
> Fraud Section, Criminal Division
> U.S. Department of Justice
> 1400 New York Avenue, N.W.
> Room 3428
> Washington, D.C. 20530
> Tel: (202) 353-2393
> Fax: (202) 514-0152