UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

UNITED STATES COURTS
SOUTHERN DISTRICT OF TEXAS
FILED

FEB 1 1 REC'D  SV

MICHAEL N. MILBY, CLERK OF COURT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Criminal No. H-09-071 |
| | ) | |
| KELLOGG BROWN & ROOT LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## PLEA AGREEMENT

Pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, the

United States of America, by and through Steven A. Tyrrell, Chief of the Fraud

Section, Criminal Division, United States Department of Justice, and William J.

Stuckwisch and Patrick F. Stokes, Senior Trial Attorneys, United States

Department of Justice, Criminal Division, Fraud Section (the "Department"), and

the Defendant Kellogg Brown & Root LLC ("KBR," the "Company," or the

"Defendant") and KBR, Inc., on behalf of its wholly owned subsidiary KBR,

through their undersigned attorneys, and pursuant to authority granted by KBR,

Inc.'s Board of Directors, hereby submit this Plea Agreement ("Agreement"). The

terms and conditions of this Agreement are as follows:

## The Defendant's Agreement

1.    The Defendant agrees to waive indictment and plead guilty to a five-count criminal information to be filed in the Southern District of Texas charging KBR with conspiracy to commit offenses against the United States, in violation of 18 U.S.C. § 371, that is, to violate the Foreign Corrupt Practices Act of 1977 ("FCPA"), as amended, 15 U.S.C. § 78dd-1 *et seq.* (Count 1), and substantive violations of the FCPA, 15 U.S.C. § 78dd-2 (Counts 2 through 5). The Defendant further agrees to persist in that plea through sentencing and, as set forth below, to fully cooperate with the United States.

2.    The Defendant understands and agrees that this Agreement is between the Department, KBR, and KBR, Inc., on behalf of its wholly owned subsidiary KBR. Except with respect to the investigation described in paragraph 10(c), this Agreement does not bind any other division or section of the Department of Justice or any other federal, state, local, or foreign prosecuting, administrative, or regulatory authority. With respect to the investigation described in paragraph 10(c), this Agreement also binds the Antitrust Division of the Department of Justice. The Department will bring this Agreement and the cooperation of KBR to the attention of other prosecuting authorities or other agencies, if requested.

3.    The Defendant agrees that this Agreement will be executed by an authorized corporate representative. The Defendant further agrees that a

Resolution duly adopted by the Board of Directors of KBR, Inc., on behalf of its subsidiary KBR, in the form attached to this Agreement as Exhibit 1, or in a substantially similar form, represents that the signature on this Agreement by KBR and its counsel are authorized by the Board of Directors of KBR, Inc., on behalf of its subsidiary KBR.

4.     KBR and KBR, Inc., on behalf of KBR, agree and represent that each has the full legal right, power, and authority to enter into and perform all obligations under this Agreement.

5.     The Defendant agrees that the fine imposed by the Court will be due and payable according to the schedule specified in paragraph 18, and the Defendant will not attempt to avoid or delay payments.  The Defendant acknowledges that no tax deduction may be sought in connection with the payment of the fine.  The Defendant further agrees to pay the Clerk of the Court for the United States District Court for the Southern District of Texas the mandatory special assessment of $400 per count within five (5) business days from the date of sentencing.

6.     The Defendant and KBR, Inc. agree if either company issues a press release in connection with this Agreement, the Defendant and/or KBR, Inc. shall first consult with the Department to determine whether (a) the text of the release is

3

true and accurate with respect to matters between the Department and the Defendant; and (b) the Department has no objection to the release.

7.       The Defendant and KBR, Inc. agree to abide by all terms and obligations of this Agreement as described herein, including but not limited to the following:

        a.       To plead guilty as set forth in this Agreement;

        b.       To abide by all sentencing stipulations contained in this Agreement;

        c.       To: (i) appear, through duly appointed representatives, as ordered for all Court appearances; and (ii) obey any other ongoing Court order in this matter;

        d.       To commit no further crimes;

        e.       To be truthful at all times with the Court;

        f.       To pay the applicable fine and special assessment; and

        g.       To fulfill the obligations described in Exhibit 2 (with respect to the retention of an independent corporate monitor).

8.       The Defendant further agrees to cooperate with the Department as directed and with any other federal, state, local, or foreign law enforcement agency as directed by the Department.  This cooperation requires that Defendant:

4

a.     Provide full disclosure of all information concerning corrupt payments and related false accounting known to the Defendant or its outside counsel as of the date of this Agreement;

b.     Provide access to copies of non-privileged original documents and records relating to such payments and related false accounting if requested to do so; and

c.     Provide and/or ensure that the Department is given access to all current and, to the extent possible, former KBR directors, officers, employees, agents, and consultants for interviews and testimony in the United States relating to such payments and related false accounting.

9.     The Defendant and KBR, Inc. agree that in the event they sell, merge, or transfer all or substantially all of the Defendant's business operations as they exist as of the date of this Agreement, whether such sale(s) is/are structured as a stock or asset sale, merger, or transfer, they shall include in any contract for sale, merger, or transfer a provision fully binding the purchaser(s) or any successor(s) in interest thereto to the obligations described in this Agreement.

### The United States' Agreement

10.     In exchange for the corporate guilty plea of the Defendant and the complete fulfillment of all of its obligations under this Agreement, and in exchange for the agreement of the Defendant's parent company, KBR, Inc., to assume all of

the obligations set forth in Paragraphs 1 through 9 on its behalf and on behalf of the Defendant, the Department agrees that it will not file additional criminal charges against the Defendant or KBR, Inc. relating to:

      a.    the conduct described in the Statement of Facts attached as Exhibit 3;

      b.    the making or promising of other corrupt payments provided that such conduct was disclosed or otherwise known to the Department prior to the date on which this Agreement was signed; or

      c.    KBR's alleged coordination of bids on foreign liquefied natural gas plant engineering and construction projects provided that such conduct was disclosed or otherwise known to the Department prior to the date on which this Agreement was signed.

11.    This Agreement does not provide any protection against prosecution for any corrupt payments, false accounting, or bid coordination in the future by KBR, KBR, Inc., or any of their directors, officers, employees, agents, or consultants, regardless of whether disclosed by KBR or KBR, Inc.  This Agreement also will not close or preclude the investigation or prosecution of any natural persons, including any directors, officers, employees, agents or consultants of KBR or KBR, Inc. who may have been involved in any of the matters set forth in the Information, Statement of Facts, or in any other matters.

## Factual Basis

12.     The Defendant is pleading guilty because it is guilty of the charges contained in Counts 1 through 5 of the Information.  The Defendant agrees and stipulates that the factual allegations set forth in the Information are true and correct and accurately reflect the Defendant's criminal conduct.  The parties further stipulate and agree to the Statement of Facts attached hereto and incorporated herein as Exhibit 3.

## The Defendant's Waiver of Rights, Including Right to Appeal

13.     The Defendant represents to the Court that it is satisfied that its undersigned attorneys have rendered effective assistance.  The Defendant understands that by entering into this Agreement, it surrenders certain rights as provided in this Agreement.  The Defendant understands that the rights of a defendant include the following:

a.      If the Defendant persisted in a plea of not guilty to the charges, the Defendant would have the right to a speedy jury trial with the assistance of counsel.  The trial may be conducted by a judge sitting without a jury if the Defendant, the United States, and the court all agree.

b.      At a trial, the United States would be required to present witnesses and other evidence against the Defendant.  The Defendant would have the opportunity to confront those witnesses and its attorney would be allowed to

7

cross-examine them.  In turn, the Defendant could, but would not be required to, present witnesses and other evidence on his own behalf.   If the witnesses for the Defendant would not appear voluntarily, it could require their attendance through the subpoena power of the court.

   c. At a trial, no inference of guilt could be drawn from the Defendant's refusal to present evidence.  However, if the Defendant desired to do so, it could present evidence on its behalf.

   14. The Defendant knowingly, intelligently, and voluntarily waives its right to appeal the conviction in this case.  The Defendant similarly knowingly, intelligently, and voluntarily waives the right to appeal the sentence imposed by the court.  In addition, the Defendant knowingly, intelligently, and voluntarily waives the right to bring a collateral challenge pursuant to 28 U.S.C. § 2255, challenging either the conviction, or the sentence imposed in this case, except for a claim of ineffective assistance of counsel.  The Defendant waives all defenses based on venue.  The Defendant waives all defenses based on the statute of limitations with respect to any prosecution that is not time-barred on the date that this Agreement is signed in the event that: (a) the conviction is later vacated for any reason; (b) the Defendant violates this Agreement; or (c) the plea is later withdrawn.  The Department is free to take any position on appeal or any other post-judgment matter.

## Punishment Range

15.     The statutory maximum sentence that the Court can impose for a violation of Title 18, United States Code, Section 371, is a fine of $500,000 or twice the gross gain or gross loss resulting from the offense, whichever is greatest, 18 U.S.C. §§ 3571(c)(3) and (d); five years' probation, 18 U.S.C § 3561(c)(1); and a mandatory special assessment of $400, 18 U.S.C. § 3013(a)(2)(B).  The statutory maximum sentence that the Court can impose for each violation of Title 15, United States Code, Section 78dd-2, is a fine of $2,000,000 or twice the gross gain or gross loss resulting from the offense, whichever is greatest, 15 U.S.C. § 78dd-2(g), 18 U.S.C. § 3571(d); five years' probation, 18 U.S.C § 3561(c)(1); and a mandatory special assessment of $400, 18 U.S.C. § 3013(a)(2)(B).  The statutory maximum sentences for multiple counts can be aggregated and run consecutively.

## Sentencing Factors

16.     The parties agree that pursuant to United States v. Booker, 543 U.S. 220 (2005), the Court must determine an advisory sentencing guideline range pursuant to the United States Sentencing Guidelines.  The Court will then determine a reasonable sentence within the statutory range after considering the advisory sentencing guideline range and the factors listed in 18 U.S.C. § 3553(a). The parties' agreement herein to any guideline sentencing factors constitutes proof of those factors sufficient to satisfy the applicable burden of proof.  The Defendant

9

also understands that if the Court accepts this Agreement, the Court is bound by the sentencing provisions in paragraph 18.

17.    The Department and the Defendant agree that a faithful application of the United States Sentencing Guidelines (USSG) to determine the applicable fine range yields the following analysis:

a.    The 2003 USSG Manual sets forth the appropriate guidelines to be used in this matter.

b.    Base Fine: Based upon USSG § 8C2.4 and USSG § 2C1.1(d)(1)(B), the base fine is $235.5 million, which corresponds to the value of the benefit KBR received in return for the unlawful payments.

c.    Culpability Score: Based upon USSG § 8C2.5, the culpability score is 8, summarized as follows:

| | | |
|---|---|---|
| (a) | Base Culpability Score | 5 |
| (b)(1)(A) | The organization had 5,000 or more employees and individuals within high-level personnel participated in, condoned, or were willfully ignorant of the offense and tolerance of the offense by substantial authority personnel was pervasive throughout the organization | 5 |
| (g) | The organization fully cooperated in the investigation and clearly demonstrated recognition and affirmative acceptance of responsibility for criminal conduct | -2 |
| | Total | 8 |

d.  Calculation of Fine Range: Based upon USSG § 8C2.7, the fine range is calculated as follows:

| | |
|---|---|
| Base Fine | $235.5 million |
| Multipliers | 1.6/ 3.2 |
| Fine Range | $376.8 million/$753.6 million |

### Sentencing Recommendation

18.  Pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure, the Department and the Defendant agree that the following represents the appropriate disposition of the case:

a.  <u>Fine.</u>  The parties agree that the imposition of a fine in the amount of $402,000,000 is appropriate in this case.  The parties further agree that this fine amount shall be paid in installments as follows: $52,000,000 within five (5) business days after the imposition of sentence in this matter; and seven installments of $50,000,000, each due on the first day of each quarter beginning April 1, 2009, and ending October 1, 2010.

b.  <u>Organizational Probation.</u>  The parties agree that a three-year term of organizational probation is appropriate in this case and shall include, as a condition of probation, the retention of an independent corporate monitor as described in Exhibit 2, as well as any other conditions ordered by the Court.

c.      <u>Mandatory Special Assessment.</u>  The Defendant shall pay to the Clerk of the Court for the United States District Court for the Southern District of Texas within (5) business days of the time of sentencing the mandatory special assessment of $400 per count.

19.     The parties have agreed that the disposition described herein is the appropriate disposition of the case based upon the following factors:

a.      By entering pleas of guilty to the charges in the Information and fulfilling the obligations under this Agreement, the Defendant has demonstrated recognition and affirmative acceptance of responsibility for its criminal conduct;

b.      The fine, which is approximately $25,000,000 above the bottom of the advisory sentencing guideline range, reflects the egregiousness and long duration of the criminal conduct, KBR's leadership role in that conduct, and the fact that KBR's use of international sales agents to make corrupt payments to foreign government officials does not appear to have been limited to a single project.

20.     The Defendant understands that, if the Court rejects this Agreement, the Court must:

a.      inform the parties that the Court rejects the Agreement;

12

b.      advise Defendant's counsel that the Court is not required to follow the Agreement and afford the Defendant the opportunity to withdraw the plea; and

c.      advise the Defendant that if the plea is not withdrawn, the Court may dispose of the case less favorably toward the Defendant than the Agreement contemplated.

The Defendant further understands that if the Court refuses to accept any provision of this Agreement, neither party shall be bound by the provisions of the Agreement.

### Consolidation of Plea and Sentencing and Waiver of Presentence Investigation

21.      The parties agree, subject to the Court's approval, to waive the requirement for a presentence report, pursuant to Federal Rule of Criminal Procedure 32(c)(1)(A), based on a finding by the Court that the record contains information sufficient to enable the Court to meaningfully exercise its sentencing power.  However, the parties agree that in the event the Court orders the preparation of a presentence report prior to sentencing, such order will not affect the agreement set forth herein.  Additionally, if the Court directs the preparation of a presentence report, the Department will fully inform the preparer of the

13

presentence report and the Court of the facts and law related to the Defendant's case.

22.     The parties further agree to request that the Court combine the entry of the guilty pleas and sentencing into one proceeding.  However, the parties agree that in the event the Court orders that the entry of the guilty pleas and sentencing hearing(s) occur at separate proceedings, such an order will not affect the Agreement set forth herein.

## Breach of Agreement

23.     If KBR, or KBR, Inc. on behalf of KBR, breaches the terms of this Agreement, or commits any new criminal offense between signing this Agreement and sentencing, the Department is relieved of its obligations under this Agreement, but KBR may not withdraw any guilty pleas.  Whether the Defendant has breached any provision of this Agreement shall be determined solely by the Department.

24.     In the event of a breach of this Agreement by KBR:

a.     KBR shall be fully subject to criminal prosecution for any crimes, including perjury and obstruction of justice;

b.     the Department will be free to use against KBR, directly and indirectly, in any criminal or civil proceeding any of the information or materials provided by KBR pursuant to this agreement, as well as the admitted Statement of Facts attached hereto as Exhibit 3; and

14

c.      should the Department elect to pursue criminal charges or any

civil action that was not filed as a result of this Agreement, then KBR agrees that

any applicable statute of limitations is tolled between the date of KBR's signing of

this Agreement and the discovery by the Department of any breach by KBR, and

KBR waives all defenses based on the statute of limitations, venue, any claim of

preindictment delay, or any speedy trial claim with respect to any such prosecution

or action, except to the extent that such defenses existed as of the date of the

signing of this Agreement.

### Complete Agreement

25.      This Agreement states the full extent of the agreement between the

parties.  There are no other promises or agreements, express or implied.  Any

modification of this Agreement shall be valid only if set forth in writing in a

supplemental or revised plea agreement signed by all parties.

FOR KELLOGG BROWN & ROOT LLC and KBR, INC:

PAUL, HASTINGS, JANOFSKY &
WALKER LLP

By:     _William F. Pendergast_
William F. Pendergast
Timothy L. Dickinson
Jennifer D. Riddle
875 15th Street, N.W.
Washington, D.C. 20005
Tel: (202) 551-1865
Fax: (202) 551-0265

15

FOR THE DEPARTMENT:

STEVEN A. TYRRELL
CHIEF, FRAUD SECTION
CRIMINAL DIVISION
U.S. DEPARTMENT OF JUSTICE


By:  _William J. Stuckwisch_

William J. Stuckwisch
D.C. Bar No. 457278
Patrick F. Stokes
Maryland State Bar
Senior Trial Attorneys
Fraud Section, Criminal Division
U.S. Department of Justice
1400 New York Avenue, N.W.
Room 3428
Washington, D.C. 20530
Tel: (202) 353-2393
Fax: (202) 514-0152


Filed at Houston, Texas, on February __, 2009.

## OFFICER'S CERTIFICATE

I have read this Agreement and carefully reviewed every part of it with counsel for Kellogg Brown & Root LLC ("KBR") and KBR, Inc.  I understand the terms of this Agreement and voluntarily agree, on behalf of KBR and KBR, Inc., to each of its terms.  Before signing this Agreement on behalf of KBR and KBR, Inc., I consulted with counsel for KBR and KBR, Inc.  Counsel fully advised me of the rights of KBR and KBR, Inc., of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into this Agreement.

I have carefully reviewed this Agreement with the Board of Directors of KBR, Inc.  I have advised, and caused outside counsel for KBR and KBR, Inc. to advise, the Board fully of the rights of KBR and KBR, Inc., of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into the Agreement.

No promises or inducements have been made other than those contained in this Agreement.  Furthermore, no one has threatened or forced me, or to my knowledge any person authorizing this Agreement on behalf of KBR and KBR, Inc., in any way to enter into this Agreement.  I am also satisfied with counsel's representation in this matter.

17

I certify that I am an officer of KBR, Inc. and that I have been duly authorized by KBR and KBR, Inc. to execute this Agreement on behalf of KBR and KBR, Inc.

Date: February 9, 2009

KELLOGG BROWN & ROOT LLC and KBR, INC.

By: _____

Andrew D. Farley
Senior Vice President and General Counsel

## CERTIFICATE OF COUNSEL

We are counsel for Kellogg Brown & Root LLC ("KBR") and KBR, Inc. in the matter covered by this Agreement. In connection with such representation, we have examined relevant KBR documents and have discussed this Agreement with the Board of Directors of KBR, Inc. and authorized representatives of KBR and KBR, Inc. Based on our review of the foregoing materials and discussions, we are of the opinion that KBR's and KBR, Inc.'s representatives have been duly authorized to enter into this Agreement on behalf of KBR and KBR, Inc. This Agreement has been duly and validly authorized, executed, and delivered on behalf of KBR and KBR, Inc. and is a valid and binding obligation of KBR and KBR, Inc. Further, we have carefully reviewed every part of this Agreement with the Board of Directors and General Counsel of KBR, Inc. We have fully advised them of KBR's rights, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into this Agreement. To our knowledge, KBR's and KBR, Inc.'s decision to enter into this Agreement is an informed and voluntary one.

Date: _February 9, 2009_

_William F. Pendergast_

Timothy L. Dickinson
William F. Pendergast
Jennifer D. Riddle
PAUL, HASTINGS, JANOFSKY & WALKER LLP
875 15th Street, N.W.
Washington, D.C. 20005

# EXHIBIT 1

## <u>CERTIFICATE OF CORPORATE RESOLUTIONS</u>

A copy of the executed Certificate of Corporate Resolutions is annexed hereto as

"Exhibit 1."

## KBR INC.
## CERTIFICATE OF CORPORATE RESOLUTIONS

I, Jeffrey B. King, do hereby certify that I am the Secretary of KBR Inc. (the "Company"), a company incorporated in Delaware, and that the following is an accurate excerpt of certain resolutions unanimously adopted by the Board of Directors of KBR Inc. at a meeting held on February 6, at which a quorum was present.

**WHEREAS,** the Board of Directors of KBR Inc., a Delaware corporation (the "Company") has been informed by its counsel of a proposed settlement with the United States Department of Justice ("DOJ") in relation to certain matters which have been under investigation by DOJ (the "Proposed Settlement"), and the key terms of the Proposed Settlement have been distributed to the members of the Board as Annex 1 to the Proposed Settlement Resolutions;

**WHEREAS,** the Proposed Settlement contemplates

(1)  Kellogg Brown & Root LLC ("KBR LLC"), an indirectly wholly owned subsidiary of the Company, pleading guilty to certain crimes pursuant to a plea agreement with the DOJ (the "Plea Agreement"),

(2)  the government and KBR LLC agreeing to recommend to the court a fine of $402 million as appropriate under the circumstances (under the Master Separation Agreement between KBR, Inc. and Halliburton, Halliburton will pay $382 million and KBR will pay $20 million of this fine);

(3)  the court retaining under the law the final determination of the fine to be imposed;

(4)  retention of an independent corporate monitor by the Company for a term of three years;

(5)  imposition of commitments set out in the Plea Agreement on KBR LLC and the Company; and

(6)  KBR LLC agreeing to include in any sale or merger agreement the requirement that the successor or purchaser company abide by the commitments set out in items 4 and 5 above.

**NOW, THEREFORE, BE IT:**

**RESOLVED,** that the key terms of the Proposed Settlement that have been distributed to the members of the Board as Annex 1 to the Proposed Settlement Resolutions are hereby approved and the Proposed Settlement is hereby agreed to in principle by the Company;

**FURTHER RESOLVED,** that William P. Utt, President and Chief Executive Officer of the Company and KBR LLC, and Andrew D. Farley, Senior Vice President and General Counsel of the Company and KBR LLC, are each severally  authorized and directed to execute and deliver the Plea Agreement on behalf of KBR Inc. and KBR LLC and such other documents as are necessary to effect the Proposed Settlement, and to take such other and further actions as may be approved by the Board of Directors of the Company or any authorized committee or subcommittee thereof, as applicable, to consummate the Proposed Settlement and the resolution of the investigation of past payments and practices referenced above, including appearing before

the United States District Court for the Southern District of Texas, Houston Division, to enter pleas of guilty on behalf of KBR LLC and accept the sentence of the Court.

IN WITNESS WHEREOF, I have executed this Certificate on February 6, 2009.

JEFFREY B. KING
SECRETARY

UNITED STATES OF AMERICA  §
                          §
THE STATE OF TEXAS        §

This instrument was acknowledged before me on February 6, 2009, by Jeffrey B. King, Secretary of KBR, Inc.

NOTARY in and for the State of Texas

**EXHIBIT 2**

**Independent Corporate Monitor**

1.     Within sixty (60) calendar days of the execution of this Agreement,

Kellogg Brown & Root LLC ("KBR") agrees to retain an independent corporate

monitor (the "Monitor") for the term specified in paragraph 2 below.  The

Monitor's primary responsibility is to assess and monitor the Company's

compliance with the terms of this Agreement so as to specifically address and

reduce the risk of any recurrence of the Company's misconduct, including

evaluating the Company's corporate compliance program with respect to the

Foreign Corrupt Practices Act of 1977 ("FCPA"), as amended, 15 U.S.C. §§ 78dd-

1, *et seq.*, and other relevant anti-corruption laws. Within thirty (30) calendar days

after the signing of this Agreement, and after consultation with the Department,

KBR will propose to the Department a pool of three qualified candidates to serve

as the Monitor.  If the Department, in its sole discretion, is not satisfied with the

candidates proposed, the Department reserves the right to seek additional

nominations from KBR.  The Monitor candidates shall have, at a minimum, the

following qualifications:

a.     demonstrated expertise with respect to the FCPA, including

experience counseling on FCPA issues;

b.      experience designing and/or reviewing corporate compliance policies, procedures and internal controls, including FCPA-specific policies, procedures and internal controls;

c.      the ability to access and deploy resources as necessary to discharge the Monitor's duties as described in the Agreement; and

d.      sufficient independence from KBR to ensure effective and impartial performance of the Monitor's duties as described in the Agreement.

2.      The Department retains the right, in its sole discretion, to choose the Monitor from among the candidates proposed by KBR, though KBR may express its preference(s) among the candidates.  Subject to paragraph 6(e)(vi) below, the Monitor's term shall expire three (3) years from the date of sentencing or on the date that KBR's term of probation ends, whichever is later.  If the Monitor resigns or is otherwise unable to fulfill his obligations as set out herein, KBR shall within thirty (30) calendar days recommend a pool of three qualified Monitor candidates from which the Department will choose a potential replacement.  The Monitor's duties and authorities, and the obligations of KBR with respect to the Monitor and the Department, are set forth below.

3.      KBR agrees that it will not employ or be affiliated with the Monitor for a period of not less than one year from the date the Monitor's work has ended.

2

4.      The Monitor will review and evaluate the effectiveness of KBR's internal controls, record-keeping, and financial reporting policies and procedures as they relate to KBR's compliance with the books and records, internal accounting controls and anti-bribery provisions of the FCPA, and other applicable anti-corruption laws.  This review and evaluation shall include an assessment of those policies and procedures as actually implemented.  The retention agreement between KBR and the Monitor will reference this Agreement and include this Agreement as an attachment so the Monitor is fully apprised of his or her duties and responsibilities.

5.      KBR and KBR, Inc. shall cooperate fully with the Monitor and the Monitor shall have the authority to take such reasonable steps as, in his or her view, may be necessary to be fully informed about the corporate compliance program of KBR within the scope of his or her responsibilities under this Agreement.  To that end, KBR shall provide the Monitor with access to all information, documents, and records that are not subject to protection from disclosure by the attorney-client privilege or the attorney work product doctrine and facilities and/or employees that fall within the scope of responsibilities of the Monitor under this Agreement.  Any such disclosure by KBR to the Monitor concerning corrupt payments, related books and records, and related internal

controls shall not relieve KBR of its obligation truthfully to disclose such matters to the Department.

a. The parties agree that the Monitor is an independent third-party, not an employee or agent of the Company or the Department, and that no attorney-client relationship shall be formed between KBR and the Monitor.

b. In the event that KBR seeks to withhold from the Monitor access to information, documents, records, facilities and/or employees of KBR on grounds that the information, documents, records, facilities and/or employees are protected from disclosure by the attorney-client privilege or the attorney work-product doctrine, KBR shall work cooperatively with the Monitor to resolve the matter to the satisfaction of the Monitor. If the matter cannot be resolved, at the request of the Monitor, KBR shall promptly provide written notice to the Monitor and the Department. Such notice shall include a general description of the nature of the information, documents, records, facilities and/or employees that are being withheld, as well as the basis for the claim.

6. KBR agrees that:

a. The Monitor shall assess whether KBR's existing policies and procedures are reasonably designed to detect and prevent violations of the FCPA and other applicable anti-corruption laws.

4

b.     The Monitor shall evaluate KBR's compliance with this Agreement.

c.     The Monitor shall review KBR's implementation of and adherence to all existing, modified, or new policies and procedures relating to FCPA compliance.

d.     The Monitor shall ensure that FCPA policies and procedures are appropriately designed to accomplish their goals.

e.     During the Monitor's term, the Monitor shall conduct an initial review and prepare an initial report, followed by two follow-up reviews and reports as described below:

i.     With respect to each of the three (3) reviews, after initial consultations with KBR and the Department, the Monitor shall prepare a written work plan for each of the reviews, which shall be submitted to KBR and the Department for comment prior to commencement of each review.  In order to conduct an effective initial review and to understand fully any existing deficiencies in controls, policies and procedures related to the FCPA and other applicable anti-corruption laws, the Monitor's initial work plan shall include such steps as are reasonably necessary to develop an understanding of the facts and circumstances surrounding any violations that may have occurred, but the parties do not intend that the Monitor will conduct his or her own inquiry into those historical events.

5

Any disputes between KBR, on the one hand, and the Monitor, on the other hand, with respect to the work plan shall be decided by the Department in its sole discretion.

   ii. In connection with the initial review, the Monitor shall issue a written report within one hundred twenty (120) calendar days of his or her retention setting forth the Monitor's assessment and, if appropriate and necessary, making recommendations reasonably designed to improve the policies and procedures of KBR for ensuring compliance with the FCPA and other applicable anti-corruption laws.  The Monitor shall provide the report to the Board of Directors of KBR and contemporaneously transmit copies to Mark F. Mendelsohn (or his successor), Deputy Chief, Fraud Section, Criminal Division, U.S. Department of Justice, 10th and Constitution Ave., N.W., Bond Building, Fourth Floor, Washington, DC 20530.  The Monitor may extend the time period for issuance of the report with prior written approval of the Department.

   iii. Within sixty (60) calendar days after receiving the Monitor's report, KBR shall adopt the recommendations set forth in the report; provided, however, that within thirty (30) calendar days after receiving the report, KBR shall advise the Monitor and the Department in writing of any recommendations that KBR considers unduly burdensome, impractical, costly or otherwise inadvisable.  With respect to any recommendation that KBR considers

unduly burdensome, impractical, costly or otherwise inadvisable, KBR need not

adopt that recommendation; instead, KBR may propose in writing an alternative

policy, procedure, or system designed to achieve the same objective or purpose.

As to any recommendation on which KBR and the Monitor ultimately do not

agree, the views of KBR and the Monitor shall promptly be brought to the attention

of the Department.  Any disputes between KBR, on the one hand, and the Monitor,

on the other hand, with respect to the recommendations shall be decided by the

Department in its sole discretion.  The Department may consider the Monitor's

recommendation and the Company's reasons for not adopting the recommendation

in determining whether KBR has fully complied with its obligations under this

Agreement.

        iv.    The Monitor shall undertake two follow-up reviews to

further monitor and assess whether the policies and procedures of KBR are

reasonably designed to detect and prevent violations of the FCPA, and other

applicable anti-corruption laws.

        v.    Within sixty (60) calendar days of initiating each

follow-up review, the Monitor shall: (A) complete the review; (B) certify whether

the anti-bribery compliance program of KBR, including its policies and

procedures, is appropriately designed and implemented to ensure compliance with

the FCPA and other applicable anti-corruption laws; and (C) report on the Monitor's findings in the same fashion as with respect to the initial review.

vi.     The first follow-up review shall commence one year after KBR's adoption of the Monitor's recommendations from the initial review. The second follow-up review shall commence one year after the first follow-up review commenced. If, reasonably promptly after completing the first follow-up review, the Monitor and KBR mutually agree that KBR's compliance program is reasonably designed and implemented to detect and prevent violations of anti-corruption laws, and that further monitoring and review is not warranted, the Monitor may apply to the Department for permission to forego the second follow-up review. If the Department approves, the term of the Monitorship shall be reduced accordingly. Conversely, if, reasonably promptly after completing two follow-up reviews, the Monitor and the Department agree that KBR has not successfully satisfied its obligations under the plea agreement with respect to the Monitor's mandate, the term of the Monitorship shall be extended for a period the Department deems appropriate.

vii.    The Monitor may extend the time period for submission of the follow-up reports with prior written approval of the Department.

7.     In undertaking the assessments and reviews described above, the Monitor shall formulate conclusions based on, among other things:  (a) inspection

8

of relevant documents, including all the policies and procedures relating to the

anti-corruption compliance program of KBR; (b) onsite observation of the systems

and procedures of KBR, including their internal controls and record-keeping and

internal audit procedures; (c) meetings with, and interviews of, relevant employees,

officers, directors and other persons at mutually convenient times and places; and

(d) analyses, studies and testing of the anti-corruption compliance program of

KBR.

8.      Should the Monitor, during the course of his or her engagement,

discover credible evidence that questionable or corrupt payments or questionable

or corrupt transfers of property or interests may have been offered, promised, paid

or authorized by any KBR entity or person, or any entity or person working

directly or indirectly for KBR, or that related false books and records have been

maintained, the Monitor shall promptly report such conduct to KBR's General

Counsel, to its Audit Committee, and to its outside counsel for further

investigation, unless the Monitor believes, in the exercise of his or her discretion,

that such disclosure should be made directly to the Department.  If the Monitor

refers the matter only to KBR's General Counsel, Audit Committee, and outside

counsel, KBR shall promptly report the same to the Department and

contemporaneously notify the Monitor that such report has been made.  If KBR

fails to make disclosure to the Department within ten (10) calendar days of the

Monitor's report of such conduct to KBR, the Monitor shall independently disclose his or her findings to the Department at the address listed in paragraph 6e(ii) above. Further, in the event that KBR, or any entity or person working directly or indirectly for KBR, refuses to provide information necessary for the performance of the Monitor's responsibilities, the Monitor shall disclose that fact to the Department. KBR shall not take any action to retaliate against the Monitor for any such disclosures or for any other reason. The Monitor may, at his or her discretion, report other criminal or regulatory violations discovered in the course of performing his or her duties, in the same manner as described above.

9.     At least annually, and more frequently if appropriate, representatives from KBR and the Department will meet together to discuss the Monitorship and any suggestions, comments, or improvements that KBR may wish to discuss with or propose to the Department.

## EXHIBIT 3

## STATEMENT OF FACTS

The following Statement of Facts is incorporated by reference in the Plea Agreement between the United States Department of Justice, KBR, Inc., and Kellogg Brown & Root LLC, and the parties hereby agree and stipulate that the following information is true and accurate. Kellogg Brown & Root LLC admits, accepts, and acknowledges that it is responsible for the acts of its predecessor companies' officers, employees, and agents as set forth below. Had this matter proceeded to trial, the United States would have proven beyond a reasonable doubt, by admissible evidence, the facts alleged in the Information. This evidence would have established the following:

### *The Defendant, Its Predecessor Companies, and Their CEO*

1.      Kellogg Brown & Root LLC is a wholly owned subsidiary of KBR, Inc., a publicly traded company incorporated in Delaware in 2006 and headquartered in Houston, Texas. Kellogg Brown & Root LLC is the successor company to Kellogg Brown & Root, Inc. and, before that, to The M.W. Kellogg Company. Throughout this Statement of Facts, "KBR" shall refer to Kellogg Brown & Root LLC and its predecessor companies. KBR was engaged in the business of providing engineering, procurement, and construction ("EPC") services

around the world, including designing and building liquefied natural gas ("LNG") production plants.  KBR was incorporated in Delaware and headquartered in Houston, Texas.  KBR was a "domestic concern" within the meaning of the FCPA, Title 15, United States Code, Section 78dd-2.

2.       Albert Jackson Stanley ("Stanley") was a United States citizen and a resident of Houston, Texas.  Stanley served in various capacities as an officer and/or director of KBR, including as President from in or about June 1995 until in or about 1997, Chief Executive Officer from in or about 1997 until in or about March 2001, and Chairman from in or about April 2001 until in or about June 2004.  Stanley was a "domestic concern" and an officer, employee, and agent of a "domestic concern" (KBR) within the meaning of the FCPA, Title 15, United States Code, Section 78dd-2.

3.       Stanley was one of the executives at KBR with responsibility for obtaining the EPC contracts to design and build an LNG plant and several expansions on Bonny Island, Nigeria (the "Bonny Island Project"), described in paragraph 15 below.  Stanley and other KBR officers, employees, and agents believed that support of Nigerian government officials, including top-level executive branch officials, high-level Petroleum Ministry officials, NNPC officials, and NLNG officials and employees, was necessary for the EPC contracts to construct the Bonny Island Project to be awarded to KBR and the Joint Venture

2

described in paragraph 4 below.  Stanley and other KBR officers, employees, and agents also knew that it was unlawful under U.S. law to bribe foreign government officials.

### The Joint Venture, Its Members, and Related Entities

4.      The "Joint Venture" was a four-company joint venture formed in 1991 for the purposes of bidding on and, if successful, performing a series of EPC contracts to design and build the Bonny Island Project.  The Joint Venture consisted of KBR and three other companies referred to herein as "EPC Contractor B," "EPC Contractor C," and "EPC Contractor D."  The Steering Committee of the Joint Venture consisted of high-level executives from each of the four joint venture companies, including Stanley on behalf of KBR.  Pursuant to a joint venture agreement, the Steering Committee made major decisions on behalf of the Joint Venture, including whether to hire agents to assist the Joint Venture in winning EPC contracts, whom to hire as agents, and how much to pay the agents.  Profits, revenues, and expenses, including the cost of agents, were shared equally among the four joint venture partners.

5.      "EPC Contractor B" was engaged in the business of providing EPC services around the world.  EPC Contractor B was headquartered in Paris, France.  In October 2001, EPC Contractor B became listed on the New York Stock Exchange.  As an issuer of publicly traded securities registered pursuant to Section

12(b) of the Securities Exchange Act of 1934, Title 15, United States Code,

Section 78l, EPC Contractor B was required to file periodic reports with the United

States Securities and Exchange Commission ("SEC") under Section 13 of the

Securities Exchange Act, Title 15, United States Code, Section 78m.  Accordingly,

beginning in October 2001, EPC Contractor B was an "issuer" within the meaning

of the FCPA, Title 15, United States Code, Section 78dd-1.

6.     "EPC Contractor C" was an engineering and construction company

headquartered in Milan, Italy.  EPC Contractor C was a wholly owned subsidiary

of an integrated energy services company headquartered in Rome, Italy.  The

parent company of EPC Contractor C was listed on the New York Stock Exchange,

had registered securities, and filed periodic reports with the SEC.  Accordingly, the

parent company of EPC Contractor C was an "issuer" within the meaning of the

FCPA, Title 15, United States Code, Section 78dd-1.

7.     "EPC Contractor D" was an engineering and construction company

headquartered in Yokohama, Japan.  EPC Contractor D was a "person" within the

meaning of the FCPA, Title 15, United States Code, Section 78dd-3.

8.     M.W. Kellogg Ltd. was a corporation organized under the laws of the

United Kingdom.  M.W. Kellogg Ltd. was 55% owned by KBR and 45% owned

by EPC Contractor D.

9.      The Joint Venture operated through three Portuguese special purpose corporations based in Madeira, Portugal: "Madeira Company 1," "Madeira Company 2," and "Madeira Company 3." Both Madeira Company 1 and Madeira Company 2 were owned equally by the four joint venture companies. However, Madeira Company 3, the entity that the Joint Venture used to enter into consulting agreements with the Joint Venture's agents, was 50% owned by M.W. Kellogg Ltd., 25% owned by EPC Contractor B, and 25% owned by EPC Contractor C. KBR held its interest in Madeira Company 3 indirectly through M.W. Kellogg Ltd., rather than directly, as part of KBR's intentional effort to insulate itself from FCPA liability for bribery of Nigerian government officials through the Joint Venture's agents. The boards of managers of Madeira Company 1 and Madeira Company 2 included U.S. citizens, including Stanley, but KBR avoided placing U.S. citizens on the board of managers of Madeira Company 3 as a further part of KBR's intentional effort to insulate itself from FCPA liability.

*The Joint Venture's Agents*

10.     "Consultant A" was a citizen of the United Kingdom and a resident of London, England. The Joint Venture hired Consultant A to help it obtain business in Nigeria, including by offering to pay and paying bribes to high-level Nigerian government officials. Consultant A was an agent of the Joint Venture and of each of the joint venture companies.

5

11.    "Consulting Company A" was a Gibraltar corporation that Consultant A used as a corporate vehicle to enter into agent contracts with and receive payments from the Joint Venture. By the time the Joint Venture had stopped paying Consulting Company A in January 2004, the Joint Venture had paid Consulting Company A over $130 million for use in bribing Nigerian government officials. Consulting Company A was an agent of the Joint Venture and of each of the joint venture companies.

12.    "Consulting Company B" was a global trading company headquartered in Tokyo, Japan. The Joint Venture hired Consulting Company B to help it obtain business in Nigeria, including by offering to pay and paying bribes to Nigerian government officials. By the time the Joint Venture had stopped paying Consulting Company B in June 2004, the Joint Venture had paid Consulting Company B over $50 million for use in bribing Nigerian government officials. Consulting Company B was an agent of the Joint Venture and of each of the joint venture companies.

### The Nigerian Government Entities

13.    The Nigerian National Petroleum Corporation ("NNPC") was a Nigerian government-owned company charged with development of Nigeria's oil and gas wealth and regulation of the country's oil and gas industry. NNPC was a shareholder in certain joint ventures with multinational oil companies. NNPC was

6

an entity and instrumentality of the Government of Nigeria, within the meaning of the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1)(A) and 78dd-2(h)(2)(A). Officers and employees of NNPC were "foreign officials," within the meaning of the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1)(A) and 78dd-2(h)(2)(A).

14.    Nigeria LNG Limited ("NLNG") was created by the Nigerian government to develop the Bonny Island Project and was the entity that awarded the related EPC contracts. The largest shareholder of NLNG was NNPC, which owned 49% of NLNG. The other owners of NLNG were multinational oil companies. Through the NLNG board members appointed by NNPC, among other means, the Nigerian government exercised control over NLNG, including but not limited to the ability to block the award of EPC contracts. NLNG was an entity and instrumentality of the Government of Nigeria, within the meaning of the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1)(A) and 78dd-2(h)(2)(A). Officers and employees of NLNG were "foreign officials," within the meaning of the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1)(A) and 78dd-2(h)(2)(A).

**The Bonny Island Project**

15.    Between 1995 and 2004, the Joint Venture was awarded four EPC contracts to build the Bonny Island Project. Each EPC contract corresponded to

7

one of the four phases in which the Bonny Island Project was constructed.   An

LNG "train" is the infrastructure necessary to pipe raw natural gas from wellheads,

convert the raw gas to purified LNG, and deliver that LNG to a tanker.   The first

phase of the Bonny Island Project consisted of two trains (Trains 1 and 2), the

second phase consisted of one train (Train 3), the third phase consisted of two

trains (Trains 4 and 5), and the fourth phase consisted of one train (Train 6).   The

first EPC contract, covering Trains 1 and 2, was awarded to the Joint Venture

through an ostensibly competitive international tender.   The other three EPC

contracts were awarded to the Joint Venture on a sole-source, negotiated basis.

The four EPC contracts awarded to the Joint Venture collectively were valued at

over $6 billion.

### *Overview of The Bribery Scheme And The Violations*

16.   From at least in or around August 1994, through in or around June

2004, KBR and its co-conspirators, including the Joint Venture, EPC Contractor B,

EPC Contractor C, EPC Contractor D, Stanley, Consultant A, Consulting

Company A, Consulting Company B, and others, participated in a scheme to

authorize, promise, and pay bribes to Nigerian government officials, including

officials of the executive branch of the Government of Nigeria, officials of NNPC,

officials of NLNG, and others, in order to secure the Nigerian government

officials' assistance in obtaining and retaining business related to the Bonny Island

8

Project.  Stanley, other officers, employees, and agents of KBR, and their co-conspirators willfully used the mails and means and instrumentalities of interstate commerce corruptly in furtherance of the authorization, promise, and payment of bribes to Nigerian government officials pursuant to the scheme.  Stanley, other officers, employees, and agents of KBR, and their co-conspirators committed acts in furtherance of the scheme in Houston, Texas.

17.    Stanley, other officers and employees of KBR, and their co-conspirators held so-called "cultural meetings" in which they discussed, among other things, the use of particular agents to pay bribes to officials of the Government of Nigeria in order to secure the officials' support for the Joint Venture in obtaining and retaining contracts to build the Bonny Island Project.

18.    In 1994, 1999, 2001, and 2002, Stanley authorized the hiring of Consultant A and Consulting Company A by the Joint Venture, expecting that Consultant A and Consulting Company A would pay bribes to high-level Nigerian government officials to assist the Joint Venture, KBR, and others in winning the EPC contracts to build the Bonny Island Project.  In 1996, 1999, and 2001, Stanley also authorized the hiring of Consulting Company B by the Joint Venture, expecting that Consulting Company B would pay bribes to lower level Nigerian government officials to assist the Joint Venture, KBR, and others in winning the EPC contracts to build the Bonny Island Project.

9

19.    Stanley, other officers and employees of KBR, and their co-conspirators caused Madeira Company 3 to execute consulting contracts with Consulting Company A and Consulting Company B providing for the payment of tens of millions of dollars in consulting fees in exchange for vaguely described marketing and advisory services, when in fact the primary purpose of the contracts was to facilitate the payment of bribes on behalf of the Joint Venture and its members to Nigerian government officials.

20.    Stanley intended that Consultant A/Consulting Company A and Consulting Company B would pay bribes to Nigerian government officials, notwithstanding provisions in the consulting agreements prohibiting bribery and notwithstanding the due diligence conducted on Consultant A and Consulting Company A.  Stanley believed that the terms of the consulting agreements and the fact that due diligence was conducted would give him and his co-conspirators the ability to plausibly deny that the true purpose of the agent arrangements was to bribe Nigerian government officials.

21.    At crucial junctures in the life of the Bonny Island Project, Stanley and others met with three successive holders of a top-level office in the executive branch of the Government of Nigeria to ask the office holder to designate a representative with whom the Joint Venture should negotiate bribes to Nigerian government officials.  Stanley and others subsequently negotiated with the office

10

holders' representatives regarding the amount of the bribes that the Joint Venture would pay to the Nigerian government officials.

22.     Stanley, other officers and employees of KBR, and their co-conspirators caused wire transfers totaling approximately $132 million to be sent from Madeira Company 3's bank account in Amsterdam, The Netherlands, to bank accounts in New York, New York, to be further credited to bank accounts in Switzerland and Monaco controlled by Consultant A for Consultant A to use to bribe Nigerian government officials.

23.     On behalf of the Joint Venture and the four joint venture companies, Consultant A wire transferred bribe payments to or for the benefit of various Nigerian government officials, including officials of the executive branch of the Government of Nigeria, NNPC, and NLNG, and for the benefit of a political party in Nigeria.

24.     Stanley, other officers and employees of KBR, and their co-conspirators caused wire transfers totaling over $50 million to be sent from Madeira Company 3's bank account in Amsterdam, The Netherlands, to Consulting Company B's bank account in Japan for Consulting Company B to use to bribe Nigerian government officials.

11

*Details of The Bribery Scheme And The Violations*

25.     On or about August 3, 1994, the M.W. Kellogg Ltd. salesperson responsible for the Bonny Island Project ("Salesperson A") sent a facsimile from London, England, to Stanley in Houston, Texas, and to other co-conspirators stating, among other things, that Stanley and other top executives of the joint venture companies had agreed to send a message "to the top man that we are ready to do business in the customary manner" and to ask Consulting Company B to secure support from the key individuals at the working level of NLNG.

26.     On or about November 2, 1994, Consultant A told Salesperson A that he had spoken with a senior official of the Nigerian Ministry of Petroleum, that Consultant A's fee would be $60 million, that the first top-level executive branch official of the Government of Nigeria would get $40-45 million of that fee, that other Nigerian government officials would get the remaining $15-20 million of that fee, and that there would be a meeting between Stanley and the first top-level Nigerian executive branch official before execution of any written agreement between the Joint Venture and Consultant A.

27.     On or about November 30, 1994, Stanley and others met with the first top-level executive branch official in Abuja, Nigeria, to verify that the official was satisfied with the Joint Venture using Consultant A as its agent and to confirm that the official wanted the Joint Venture to negotiate with the senior official of the

12

Ministry of Petroleum the amounts of bribes to various Nigerian government officials. Thereafter, as KBR's senior representative on Joint Venture's Steering Committee, Stanley authorized the Joint Venture to enter into a consulting agreement with Consulting Company A providing for the Joint Venture to pay it $60 million if the EPC contract for Trains 1 and 2 was awarded to the Joint Venture. Stanley intended that the $60 million fee would be used, in part, to pay bribes to Nigerian government officials.

28.   On or about March 20, 1995, Madeira Company 3 entered into an agreement with Consulting Company A providing, among other things, that Madeira Company 3 would pay $60 million to Consulting Company A if the Joint Venture was awarded a contract to construct Trains 1 and 2 of the Bonny Island Project.

29.   On or about December 15, 1995, Madeira Company 3 wire transferred $1,542,000 to Consulting Company A, via a correspondent bank account in New York, New York, in payment of Consulting Company A's first invoice under the consulting agreement for Trains 1 and 2.

30.   On or about April 9, 1996, Madeira Company 3 entered into an agreement with Consulting Company B whereby it agreed to pay Consulting Company B $29 million for assisting the Joint Venture in winning the contract to build Trains 1 and 2 of the Bonny Island Project.

13

31.    On or about May 1, 1997, Stanley and others again met in Abuja,

Nigeria, with the top-level executive branch official to ask the official to nominate

a representative with whom the Joint Venture should negotiate bribes to Nigerian

government officials in exchange for the first top-level executive branch official's

support of the award to the Joint Venture of an EPC contract to build Train 3.  At

the meeting, the top-level executive branch official designated a senior executive

branch official as his representative.

32.    On or about February 28, 1999, Stanley and others met in Abuja,

Nigeria, with a second top-level executive branch official.  At the meeting, Stanley

asked the second top-level executive branch official to nominate a representative

with whom the Joint Venture should negotiate bribes to Nigerian government

officials in exchange for the second top-level executive branch official's support of

the award to the Joint Venture of an EPC contract to build Train 3.  At the meeting,

the second top-level executive branch official designated one of his advisers as his

representative.

33.    On or about March 5, 1999, Stanley, other KBR officers, employees,

and agents, and their co-conspirators met at a hotel in London, England, with the

adviser designated by the second top-level executive branch official to negotiate

the amount of bribes to be paid to the second top-level executive branch official

and other Nigerian government officials in exchange for the award to the Joint

14

Venture of an EPC contract to build Train 3. The amount negotiated with the representative formed the basis for the $32.5 million fee that the Joint Venture promised to pay Consulting Company A. As KBR's senior representative on the Joint Venture's Steering Committee, Stanley authorized the Joint Venture to enter into the consulting agreement with Consulting Company A, intending that the $32.5 million fee would be used, in part, to pay bribes to Nigerian government officials.

34.     On or about March 18, 1999, Madeira Company 3 entered into an agreement with Consulting Company A providing, among other things, that Madeira Company 3 would pay $32.5 million to Consulting Company A if the Joint Venture was awarded a contract to construct Train 3 of the Bonny Island Project.

35.     On or about March 13, 2000, Madeira Company 3 entered into a consulting agreement with Consulting Company B promising to pay it $4 million in connection with Train 3 of the Bonny Island Project

36.     On or about November 11, 2001, Stanley and a KBR salesperson met in Abuja, Nigeria, with a third top-level executive branch official of the Government of Nigeria and an NNPC official (the "NNPC Official") to request that the third top-level executive branch official designate a representative with whom the Joint Venture should negotiate the bribes to Nigerian government

15

officials in exchange for the third top-level executive branch official's support of the award of the Trains 4 and 5 EPC contract to the Joint Venture. At the meeting, the third top-level executive branch official designated the NNPC Official as his representative. As KBR's senior representative on the Joint Venture's Steering Committee, Stanley authorized the Joint Venture to enter into a consulting agreement with Consulting Company A providing for the Joint Venture to pay $51 million to Consulting Company A if the EPC contract for Trains 4 and 5 was awarded to the Joint Venture. At the time, Stanley intended that the $51 million fee would be used, in part, to pay bribes to Nigerian government officials.

37.    On or about December 24, 2001, Madeira Company 3 entered into an agreement with Consulting Company A providing, among other things, that Madeira Company 3 would pay $51 million to Consulting Company A if the Joint Venture was awarded a contract to construct Trains 4 and 5 of the Bonny Island Project.

38.    In or about June 2002, Consultant A, the NNPC Official, and an employee of one of the Joint Venture's subcontractors (the "Subcontractor") met at a hotel in London, England, to discuss the NNPC Official's request that the Subcontractor help funnel payments from Consultant A to a political party in Nigeria.

16

39.    In or about June 2002, Stanley authorized the Joint Venture to enter into a consulting agreement with Consulting Company A providing for the Joint Venture to pay $23 million to Consulting Company A if the EPC contract for Train 6 was awarded to the Joint Venture.  At the time, Stanley intended that the $23 million fee would be used, in part, to pay bribes to Nigerian government officials.

40.    On or about June 14, 2002, Madeira Company 3 entered into a consulting agreement with Consulting Company B providing, among other things, that Madeira Company 3 would pay $25 million to Consulting Company B in connection with Trains 4 and 5 of the Bonny Island Project.

41.    On or about June 28, 2002, Madeira Company 3 entered into an agreement with Consulting Company A providing, among other things, that Madeira Company 3 would pay $23 million to Consulting Company A if the Joint Venture was awarded a contract to construct Train 6 of the Bonny Island Project.

42.    In or about August 2002, an employee of the Subcontractor, using funds that Consulting Company A had wire transferred to the Subcontractor, delivered a pilot's briefcase containing one million dollars in one hundred dollar bills to the NNPC Official at a hotel in Abuja, Nigeria, for the benefit of a political party in Nigeria.

43.    In or about April 2003, an employee of the Subcontractor, using funds that Consulting Company A had wire transferred to the Subcontractor, delivered a

17

vehicle containing Nigerian currency valued at approximately $500,000 to the hotel of the NNPC Official in Abuja, Nigeria, for the benefit of a political party in Nigeria, leaving the vehicle in the hotel parking lot until the NNPC Official had caused the money to be removed.

44.     On or about June 15, 2004, Madeira Company 3 wire transferred $3 million to Consulting Company B in payment of one of Consulting Company B's invoices under the agreement for Trains 4 and 5.

45.     Between on or about March 29, 1999, and on or about May 30, 2003, employees, agents, and co-conspirators of KBR caused $32,273,750 to be wire transferred from Madeira Company 3's bank account in Amsterdam, The Netherlands, via correspondent bank accounts in New York, New York, to bank accounts of Consulting Company A in Monaco and Switzerland pursuant to Madeira Company 3's consulting agreement with Consulting Company A for Train 3, intending that the money would be used, in whole or in part, to pay bribes to Nigerian government officials.

46.     Between on or about April 1, 2002, and on or about January 12, 2004, employees, agents, and co-conspirators of KBR caused $39.8 million to be wire transferred from Madeira Company 3's bank account in Amsterdam, The Netherlands, via a correspondent bank account in New York, New York, to a bank account of Consulting Company A in Switzerland pursuant to Madeira Company

18

3's consulting agreement with Consulting Company A for Trains 4 and 5, intending that the money would be used, in whole or in part, to pay bribes to Nigerian government officials.

47.     Between on or about April 17, 2000, and on or about April 30, 2003, employees, agents, and co-conspirators of KBR caused $5 million to be wire transferred from Madeira Company 3's bank account in Amsterdam, The Netherlands, to a bank account of Consulting Company B in Japan pursuant to Madeira Company 3's consulting agreement with Consulting Company B for Train 3, intending that the money would be used, in whole or in part, to pay bribes to Nigerian government officials.

48.     Between on or about August 6, 2002, and on or about June 15, 2004, employees, agents, and co-conspirators of KBR caused $17 million to be wire transferred from Madeira Company 3's bank account in Amsterdam, The Netherlands, to a bank account of Consulting Company B in Japan pursuant to Madeira Company 3's consulting agreement with Consulting Company B for Trains 4 and 5, intending that the money would be used, in whole or in part, to pay bribes to Nigerian government officials.